### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**ANGELA MARQUEZ and**
**EVA BRITO,**

                              **Plaintiffs,**

**v.**                                                    **Civ. No. 05-1349 JH/WPL**

**FANTASTIC FOOD INC. D/B/A**
**DOWNTOWN DISTILLERY,**

                              **Defendant.**


### MEMORANDUM OPINION AND ORDER

This matter came before the Court on *Defendant's Motion for Summary Judgment* [Doc. No. 57]. The issue presented in the motion is whether a genuine issue of material fact exists as to each of the remaining claims asserted by the Plaintiffs. After reviewing the law, the evidence, and the arguments of counsel, the Court concludes that the motion should be denied in its entirety.

### FACTS AND PROCEDURAL HISTORY

In 2004, Plaintiffs Angela Marquez ("Marquez") and Eva Brito ("Brito") worked as bartenders at an Albuquerque bar known as the Downtown Distillery ("the Distillery"), operated by Defendant Fantastic Foods Inc. Lance Gomez ("Gomez") was the General Manager of the Distillery, owned by Jacob Traub ("Traub").

#### Facts Relating to Plaintiff Marquez

In June of 2004, Gomez told Marquez that it was hard for him to work at the Distillery because alcohol and sex were his biggest weaknesses, "and the girls at the Distillery aren't giving

it up." Deft's Ex. B[1] at p. 1.  He also told her that he was horny, all he wanted was sex, and that if anyone wanted to get promoted "they better give it up."  *Id*. at p. 2.  Gomez stated that he wanted to have sex with a girl that worked at a nearby restaurant, but that if he failed, "I guess I'll settle for one of you."  *Id*. at p. 3.  Gomez informed Marquez that he had a graphic sexual dream about her and that he probably would have a similar dream about all of the women who worked at the Distillery.  When Marquez told Gomez that was "gross," he responded that she "wanted it."  *Id*.  *See also* Marquez Depo. at p. 14.  In addition, Gomez repeatedly touched and rubbed Marquez on her back while she was standing in the narrow space behind the bar, despite the fact she asked him to stop.  Deft's Ex. B at p. 1.  He also sang songs into her ear as he walked by, adding the word "pussy" into the lyrics of the song and saying it in her ear as he rubbed her back.  *Id*.

In July of 2004, Marquez asked Gomez if she could work on a "good shift" and also asked him why he was hiring new people when he could promote people with experience.  *Id*. at pp. 1-2.  Gomez responded that he was trying to get all the existing female employees out "because he wanted to hire better looking girls and girls that would put out."  *Id*. at p. 2.  The following month, Gomez approached Marquez and two other female employees.  He pulled out a handful of condoms, saying "I'm going to use these on you."  *Id*. at p. 2.  On August 26, 2004, Marquez filed a charge of discrimination against the Distillery with the New Mexico Human Rights Division.

At this time Marquez had been bartending on Saturday nights.  On September 9, 2004, Traub

---

[1] Defendant's Exhibit B appears to be Marquez's diary or notes relating to the events at issue in this case.  Those notes appear to have been attached to Marquez's answers to discovery requests.  Similarly, Defendant's Exhibit E contains Brito's diary or notes produced in response to discovery requests.  Both Fantastic Foods and Plaintiffs have relied upon these documents without dispute as to their authenticity or admissibility for purposes of Rule 56.  Accordingly, the Court accepts them into evidence for purposes of this motion.

received notice of Marquez's discrimination complaint.  *Id*. at p. 4.  Thereafter, he changed her work schedule so that she was bartending on Tuesday nights, and cocktail waitressing on both Monday and Saturday nights.  *Id*.  Bartenders usually earn more money in tips, with less effort, than do cocktail waitresses, and weekend nights generally are the most lucrative.  Marquez Depo. (Deft's Ex. C) at pp. 5-6**,** 26-27**.**   In addition, bar employees generally earn more money in tips on Thursdays, Fridays, and Saturdays than they do on other, less busy, days of the week.  *Id*.  Marquez asked Traub why he was taking away her Saturday bartending shift, and he responded that he was trying to accommodate everyone.  Deft's Ex. B at p. 4.  However, Traub changed no other employee's weekend shift.  *Id*. at p. 7.  Later that day Marquez interviewed and was hired for a job at another bar.  *Id*. at p. 6.  Her new employer wanted her start right away, so Marquez found another employee to cover her shift at the Distillery.  The manager of the Distillery, "Joel," told her that "shift to shift exchanges" were not permitted.  *Id*. at p. 6.  Marquez informed Joel that she had found another job because she felt that losing the Saturday night bartending shift was a demotion.  *Id*.  Joel responded that he was sorry, and that it was probably because Traub had received  the sexual harassment complaint.  *Id*.  Joel also stated that if he had made the schedule, things would be different.  *Id*.  Marquez then filed a retaliation complaint.  Marquez Depo. at p. 25.

Marquez did not inform any supervisor or Traub regarding Gomez's actions because other women working at the Distillery had informed Traub of what was happening, yet he took no action. *Id*. at p. 13; Deft's Ex. D.

### **Facts Relating to Plaintiff Brito**

In June of 2004, Gomez told Brito that the female employees at the Distillery were not as "easy" as those at his former workplace, but that would "change soon."  Deft's Ex. E.  At the time,

Brito was studying to be a massage therapist.  *Id*.  While touching Brito's neck, Gomez told her, "I'm going to get a massage from you, and get completely naked, and pop a big boner right in your face."  *Id*.  On another occasion, Gomez walked up behind Brito, put his hand on her posterior, and whispered, "Are you still married?"   *Id*.

In July of 2004, Traub called Brito into his office.  Traub explained that he had received sexual harassment complaints regarding Gomez from other female employees, and asked her if she had been harassed.  *Id*.  Brito told Traub about Gomez's comments regarding the massage and her marital status, as well as about the unwelcome touching.  *Id*.  She told Traub that Gomez made her uncomfortable.  *Id*.  About a week later, Brito asked Gomez to fix some exposed wires behind the bar that she was tending.  *Id*.  In response, he asked her if she wanted to keep her job.  *Id*.  Later that day, he put his hand around the front of her neck and said, "It's too bad you're married; just don't forget I'm the boss around here."  *Id*.

The following month, Brito gave notice that she might be moving out of town and therefore leaving her job.  *Id*.  Gomez demanded that she provide written notice.  *Id*.  Brito told him that she was not sure when she was leaving or if she would be moving at all, but Gomez told her that he needed her written notice in order to satisfy Traub.  *Id*.  If Brito did not give written notice, said Gomez, Brito would need to look for another job.  *Id*.  On August 14, 2004, Brito complied, giving Gomez written notice for September 11, exactly four weeks in advance.  *Id*.  Five days later, on August 19, Brito told Gomez that she was not moving after all and that she wanted to withdraw her notice.  *Id*.  Gomez responded, "That depends, are you still married?"  *Id*.  Brito said that she was still married, and that had nothing to do with her job.  *Id*.  Gomez stated, "We'll talk about it when you come in tomorrow, because it has a lot to do with getting your job back."  *Id*.  The following

day, Gomez called Brito into his office and again asked her if she was still married.  *Id*.  She said

that she was.  Gomez said "That's too bad.  In that case I only have a Monday and Tuesday shift for

you."  *Id*.  When Brito protested, Gomez said, "Too bad.  I have to cover my own ass, not yours."

*Id*.  Gomez then placed his hand on Brito's posterior.  *Id*.

On August 21, 2004, Brito and her husband met with Traub.  *Id*.  Brito told Traub that

Gomez had unfairly demanded that she give notice, and that she was tired of his sexual advances.

*Id*.  Traub said he would speak with Gomez.  *Id*.  A few hours later, Traub called Brito and said that

Gomez had covered Brito's shift for that night. *Id*.  When Brito protested, Traub told her to go ahead

and come to work that evening.  *Id*.  When she arrived, Traub assigned her to the tasks of checking

customer identification, monitoring a "beer tub," and cleaning walls and pool tables.  *Id*.  She earned

$40 that night, which was $200 to $230 less than she had earned per night in the previous eleven

months.  *Id*.

On August 26, 2004, Brito filed a charge of discrimination with the New Mexico Human

Rights Division.  She left her employment at the Distillery in September of 2004.

**Procedural History**

On May 23, 2005, Plaintiff Marquez (who at that time was the only plaintiff in this case)

filed the original complaint in state district court, in which she alleged the violation of her rights

under the New Mexico Human Rights Act.  The named defendant in the original complaint was

Downtown Distillery, the same entity that had participated in the administrative proceedings.  On

July 5, 2005, Plaintiff Marquez filed the first amended complaint, which added Plaintiff Brito.  Brito

asserted claims against Defendant for sex discrimination under both the New Mexico Human Rights

Act ("NMHRA") and Title VII of the Civil Rights Act of 1964.  Once again, the first amended

complaint named Downtown Distillery as the defendant.  On November 29, 2005, Plaintiffs filed

their second amended complaint, which named Fantastic Foods, Inc. d/b/a Downtown Distillery as

the defendant.  On December 29, 2005, Fantastic Foods removed the case to this federal district

court, and on May 25, 2006, the Court dismissed Brito's claims under the NMHRA.  Thus, the only

claims that remain are Brito's claims for sexual harassment and retaliation under Title VII, and

Marquez's claims for sexual harassment and retaliation under the NMHRA.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c). When determining whether judgment as a matter of law is appropriate, the Court must

"view the evidence and draw reasonable inferences therefrom in the light most favorable to the

nonmoving party."  *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999).

## I.     SEXUAL HARASSMENT

"[C]ourts have consistently recognized two distinct categories of sexual harassment claims:

quid pro quo  sexual harassment, and hostile work environment sexual harassment." *Hicks v. Gates*

*Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir. 1987).

### A.     Hostile Work Environment

A hostile work environment is one where "[sexual] conduct has the purpose or effect of

unreasonably interfering with an individual's work performance or creating an intimidating, hostile,

or offensive working environment."  *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65 (1986)

(quotation omitted).  To form the basis of a claim, the sexual harassment "must be sufficiently severe

or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id*. at 67 (quotation omitted).  As the Tenth Circuit has explained:

> For a hostile work environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (quotation marks, alteration, and citations omitted).  This requirement is "crucial . . . to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as . . . horseplay or . . . flirtation-for discriminatory 'conditions of employment.' "  *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998).  "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances ..., includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *O'Shea* at 1098 (quotation marks and citations omitted).

"The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective," and "[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Id*. at 1097-98 (quotation marks and citation omitted).  This may include "the social context in which the particular behavior occurs and is experienced by its target," and requires "[c]ommon sense, and an appropriate sensitivity to social context ... to distinguish between simple teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 81-82.  Thus, the Court's inquiry requires an assessment of the "real social

impact of workplace behavior [based] on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 82.

### 1.   Marquez

In this case, it is undisputed that both Marquez and Brito are females and therefore members of a protected group; that they were harassed by Gomez because of their sex; and that they did not welcome the sexual conduct that Gomez directed towards them. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986). However, with regard to Marquez, Fantastic Foods argues that the alleged harassment was not sufficiently severe or pervasive to create an objectively hostile work environment. The Court disagrees. For a hostile environment claim to survive a motion for summary judgment, a plaintiff must demonstrate that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that "is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Zisumbo v. McCleodUSA Telecomm. Servs., Inc.*, 154 Fed. Appx. 715, 725-26, 2005 WL 3120640 (10th Cir. 2005) (internal quotations omitted) (emphasis added) (quoting *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005)). As noted, the relevant test is a disjunctive one, requiring that the harassing conduct be sufficiently severe or sufficiently pervasive. *See Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997). With respect to severity, a plaintiff must first show that he or she believes that the conduct experienced was so severe that it created an abusive or hostile environment. *See id.* Second, the plaintiff must demonstrate that the harassing conduct was sufficiently severe that a reasonable person would find the work environment abusive or hostile. *See id.* With regard to pervasiveness, "isolated incidents

of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Id.* at 1415. In this context, the word "pervasive" is not a counting measure; the number, sequence, and timing of the conduct, and the nuances of an environment that each instance of discriminatory behavior imposes are also important factors. *See id.* Incidents of harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's hostile work environment claim. *See Hicks*, 833 F.2d at 1415. In this case, although the record is somewhat unclear as to how often Gomez physically touched Marquez or sang the word "pussy" into her ear, the record as set forth above does demonstrate a repeated pattern of sexually harassing verbal behavior, some of it quite extreme. The record before the Court demonstrates not only that Marquez subjectively found the harassment  to be severe, but also the record, viewed in the light most favorable to the Plaintiffs, could support a finding that it was objectively severe as well. The Court reaches a similar conclusion on the question of pervasiveness. Under the totality of the circumstances, a reasonable jury could find that Gomez created a pervasive atmosphere of sexual harassment sufficient to support a sexual harassment claim. Therefore, the Court finds a genuine issue of material fact on the questions of both severity and pervasiveness.

Fantastic Foods also argues that it is entitled to summary judgment on its affirmative defense under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). The *Faragher/Ellerth* affirmative defense allows an employer to avoid strict liability for one employee's sexual harassment of another. However, the defense applies only if the employer took no adverse tangible employment action against the plaintiff. *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765. If this preliminary requirement is met, then the company must prove that it exercised reasonable care in preventing and promptly correcting any sexually harassing

behavior. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. The defendant also must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 422 (10th Cir. 1999).

At this stage of the proceedings, the affirmative defense fails for several reasons. First, the evidence before the Court supports the inference that Fantastic Foods did in fact take a tangible adverse employment action against Marquez by taking away her lucrative Saturday night bartending shift and giving her less desirable work instead. Therefore, the *Faragher/Ellerth* defense does not apply. Second, because this is Fantastic Foods' affirmative defense, it bears the burden of proof on each element. Here, Fantastic Foods has failed to come forward with evidence to demonstrate that it exercised reasonable care in preventing and promptly correcting sexually harassing behavior. This might include, for example, evidence of an anti-harassment policy, employee training on harassment issues, a reasonable investigation of alleged misconduct, or the existence of a complaint procedure for reporting such misbehavior. To prevail on this defense, Fantastic Foods must do more than argue that Marquez failed to report harassment; it must demonstrate that it provided her with protection and opportunities to correct the situation. Having failed to do so, Fantastic Foods is not entitled to summary judgment on its affirmative defense.

### 2.   Brito

Fantastic Foods argues that the evidence does not demonstrate that Gomez's sexual harassment of Brito was severe and pervasive. The Court disagrees. According to the record before the Court, Gomez's offensive and suggestive comments, combined with physical contact that was

both sexual (putting his hands on her posterior) and threatening (putting his hand around the front of her neck), are sufficiently severe to withstand summary judgment.  And when combined with the evidence of Gomez's actions against Marquez, *See Hicks*, 833 F.2d at 1415, the evidence presented satisfies the "pervasiveness" prong as well.

> **B.**    **Quid Pro Quo**

With regard to quid pro quo sexual harassment, the Tenth Circuit has said that "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *See Smith v. Cashland, Inc.*, 193 F.3d 1158, 1160 (10th Cir. 1999). Tangible employment actions are those employment actions that constitute significant changes in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  An employer may refute a quid pro quo harassment claim by either proving no negative employment action took place or establishing it made the termination decision for legitimate business reasons and not because the employee refused to submit to sexual demands. *Smith*, 193 F.3d at 1160.

Again, the Court concludes that genuine issues of material fact precluding summary judgment exist on this claim.  Gomez's alleged comments to both Marquez and Brito indicate an expectation that the women under his supervision accede to his sexual demands.  Neither Marquez nor Brito did so, and subsequently both women's employment duties were changed, resulting in a reduction in their earnings.  The Court concludes that this evidence would permit a reasonable jury to infer that Plaintiffs' refusal to submit to Gomez's sexual demands resulted in tangible

11

employment actions against them.  Fantastic Foods' reliance on the absence of evidence that Gomez expressly demanded sexual favors from Marquez in exchange for a promotion or as a condition to keeping her job is unavailing.  The law does not require an express statement from the harasser linking employment benefits to the plaintiff's submission to sexual advances.  *See Brandau v. Kansas*, 968 F. Supp. 1416, 1421 (D. Kan. 1997).   With regard to Brito, Gomez's overtly sexual language and repeated touching, when combined with his insinuating questions regarding her marital status and whether she wanted to keep her job, are more than enough from which one could reasonably infer that Brito suffered quid pro quo sexual harassment.  Thus, the Court will deny Defendant's motion to dismiss this claim as well.

## II.    RETALIATION

In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection between the protected activity and the materially adverse action exists.  *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  A plaintiff may maintain an action for retaliation even though the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII.  *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1267  (10th Cir. 2005).

A plaintiff may demonstrate a causal connection with evidence of circumstances that justify an inference of retaliatory motive, such as an adverse action following protected conduct.  *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quoting *Burrus v. United Tel. Co. of Kan*., 683 F.2d 339, 343 (10th Cir. 1982)).  "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer

additional evidence to establish causation." *Id.* (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)). "[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

The Court concludes that Marquez's retaliation claim withstands Fantastic Foods' motion for summary judgment. On August 26, 2004, Marquez filed her discrimination complaint. There is no doubt that this constitutes protected action. Just two weeks later, on September 9, 2004, Traub took away Marquez's lucrative Saturday night bartending shift. Again, Fantastic Foods does not contend that a reasonable employee would not have found this action to be materially adverse. Instead, Fantastic Foods challenges the third element, causation. Despite the close temporal proximity between the two events, it attempts to offer a legitimate, non-discriminatory reason for the adverse action—that Traub was "trying to accommodate everyone." However, while it admits that this was the explanation that Traub gave Marquez, Fantastic Foods comes forward with no evidence to support the veracity of its asserted reason for changing Marquez's shift. Instead, it presents only the argument of counsel on that point. In short, there is a genuine issue of material fact on Marquez's retaliation claim.

With regard to Brito, it is undisputed that shed filed her discrimination charge with the Human Rights Division after she was demoted. Fantastic Foods argues that Brito's retaliation claim must fail because her August 21, 2004 conversation with Traub in which she reported Gomez's alleged sexual harassment does not constitute protected activity. That argument, for which Defendant provides no support, lacks merit. The Tenth Circuit has held that an internal grievance may constitute protected activity to support a retaliation claim. *Argo v. Blue Cross & Blue Shield*

*of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (finding that male employee established prima facie case of retaliation under Title VII through evidence he was fired 24 days after he filed internal grievance alleging sexual harassment by his female supervisor).  Fantastic Foods also argues that it changed Brito's work schedule for a legitimate, nondiscriminatory reason: fairness to all employees.  However, this arguments fails for the same reasons discussed with regard to Marquez—it lacks evidentiary support.  Accordingly, the Court will deny the motion for summary judgment as to Brito's retaliation claim as well.

      **IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 57] is **DENIED**.


_____
**UNITED STATES DISTRICT JUDGE**